**OUACHITA VALLEY REFINING CO. v. CONWAY, Supervisor of Accounts for Louisiana, et al.**

No. 446.

District Court, W. D. Louisiana, Shreveport Division.

May 19, 1931.

Powell, Smead & Knox, of El Dorado, Ark., for complainant.

Percy Saint, Atty. Gen., of Louisiana, and Peyton R. Sandoz, Asst. Atty. Gen., of Louisiana, J. C. Daspit, of Baton Rouge, La., and R. J. O'Neal, of Shreveport, La., for respondents.

DAWKINS, District Judge.

Plaintiff is an Arkansas corporation, engaged in the oil refining business at El Dorado, in said state, and sells some of its products to customers in Louisiana. In this case it charges that the respondents, whose duty it is to collect the highway tax on motor fuel, have seized a number of tank cars shipped into this state while the same were in the course of interstate commerce, in violation of the Federal Constitution, and that they will continue to do so to the disruption of its business and cause it to defend a multiplicity of suits, unless restrained. The relief sought is a permanent injunction.

Respondents admit efforts to collect the tax, but deny that the complainant has any standing in court, for the reason the petition alleges the bills of lading had been attached to sight drafts and discounted at the Exchange Bank & Trust Company of El Dorado, thereby disposing of its interest in the property. They further aver that the complainant is without right in equity or good conscience to seek this relief because it had been shipping into the state gasoline, falsely billed as tractor distillate, in violation of a federal statute, and for the purpose of avoiding payment of the tax; that the tank cars were billed to certain destinations and the bills of lading and drafts sent to other places, where they might be obtained by purchasers and surrendered to the railroads at points distant from the destination of the cars, in which cases the agents of the carrier would telephone authority for their release, thereby preventing and depriving respondents of an opportunity to collect the tax from those who should pay; that plaintiff would also make shipments to fictitious persons, with the view of diverting the same, if necessary, to avoid payment of the tax; and that on several occasions it sold its product to persons in Louisiana and collect-

ed the said tax on the basis of a delivered price, which tax funds it had held and converted to its own use until compelled to return them to said purchasers. Defendants, therefore, plead the maxims that "He who seeks equity must do equity," and that "He who comes into equity must come with clean hands." They pray that plaintiff's demand be rejected and its suit dismissed.

No question has been raised as to the validity of the tax, or of the right of the state to collect the same through seizure after the cars have been delivered, but plaintiff insists defendants could not do so until the drafts had been paid and the bills of lading surrendered to the carrier. It sets up three specific instances in which such seizures were made. The first covered two shipments of "December, 12, 1930" (for which it alleges an order was received on "December 15, 1930"), and December 19, 1930, to Amite, La., the bills of lading in both cases being to the shipper's own order, with instructions to notify the Amite Oil Company, to which drafts were attached, drawn upon said company and sent to a bank in that town for collection. The second seizure was of one car alleged to have been shipped in similar manner, December 24, 1930, to the Capital City Petroleum Company, at Baton Rouge, La., and the bill of lading with draft drawn on Wade Garnier, being sent to Independence, La., for collection. In the third case, plaintiff alleges that shipment was made under similar circumstances to Shreveport, La., to fill an order from one C. L. Brown, with a shipper's order bill of lading and draft drawn on Brown, sent to Texarkana, Tex. Plaintiff alleges that all three shipments, that is, to the Amite Oil Company, Amite, La., Capital City Petroleum Company, Baton Rouge, La., and C. L. Brown, Shreveport, La., were seized at these points by the state while the product was still in interstate commerce, and before any of the drafts had been paid or the bills of lading surrendered, under the pretext of collecting the tax.

I find the pertinent facts to be as follows:

Plaintiff is engaged in the refining business at El Dorado, Ark., and ships considerable quantities of its products into Louisiana, in car lots. The state has a highway tax upon the sale of motor fuels, which it collects from dealers where the product has a flash point below 110° Fahrenheit.

In the latter part of 1929 representatives of the defendant supervisor called on the president of the plaintiff company, explaining to him the difficulties which were being encountered in collecting the tax from those receiving such fuel in carload lots from without the state, and appealed to him to furnish the state reports of such shipments to aid it in preventing dealers from avoiding the tax. That gentleman promised to make such reports, but never did so.

On April 21, May 10, and October 27, 1930, respectively, shipments were made by the plaintiff to the Windsor Oil Company at Rayne, La., at a delivered price, which, at the request of the purchaser, included the state tax, and the full amount was paid, including a sufficient sum to cover the four cents per gallon highway tax. Later, during the fall of that year, the state demanded and collected the tax from the Windsor Oil Company. No report or remittance of the amount paid to plaintiff for the state was made, and it did not return the same to the purchaser until the middle of January, 1931, after the matter had been placed in the hands of attorneys at El Dorado. A similar sale was made to A. Willetts' Sons Lumber & Shingle Company at Plaquemine, La., on November 26, 1930, that is, tax paid, which was not remitted to the state until December 20, 1930, after it had demanded the tax of the purchaser. In defense of its failure to remit the tax collected from the Windsor Oil Company, plaintiff's president, as a witness, stated that it was being held to offset damages caused by the seizures herein complained of. However, the earliest of these seizures was not made until after the middle of December, 1930, some seven or eight months after the amount paid by the customer for the tax had been received by it, and this explanation is therefore not very convincing, to say the least.

The shipments made to the Amite Oil Company were billed as tractor distillate, which the state claims is not included in the class bearing the tax, while in reality it was gasoline; the contention of defendants being that this was done to deceive the agents of the state and to aid the purchasers in avoiding the tax. The shipment to Baton Rouge was made with directions to notify the Capital City Petroleum Company, which had ceased doing business there, and the bill of lading with draft drawn on Wade Garnier was sent to Independence, La. This draft was evidently paid, for the bill of lading was surrendered to the railroad agent at Amite, La., who telephoned to Baton Rouge authority to release the car. After the seizures were made on December 27th and

30th, respectively, plaintiff attempted to divert the cars to other places, those at Amite to Osyka, Miss., and the one at Baton Rouge back to El Dorado.

After the seizure of the shipment at Shreveport, which, as stated, was made under a shipper's order bill of lading, with directions to notify C. L. Brown, plaintiff surrendered the original bill of lading, and obtained another with directions to notify the Seagull Gasolene Corporation at that point. In December, 1930, a car was shipped to Lake Charles, under a similar bill of lading, with instructions to notify the Coastal Oil Company, which was sent with draft drawn on one Hempley to Shreveport, La. The state sued out attachment process at Lake Charles, but the plaintiff induced the railroad company, notwithstanding, to permit it to divert the car to Palmetto, La. The sheriff of Calcasieu parish made a return that he could not find any one representing the Coastal Oil Company. In diverting the car, the plaintiff drew a draft on one A. Slyman of Palmetto, and sent it, with bill of lading attached, to a bank at Melville, La. This draft included a four-cent per gallon tax, but Slyman refused to honor it, and the car was again seized by the state at that point.

The first seizure made of any of the cars was that at Amite, on December 24, 1930, and the others were on the 30th of that month.

Some fifty cars had been shipped by the plaintiff to Amite during the year 1930, twenty-eight of which were billed as tractor distillate, which the state contends was in reality gasoline. Samples taken from the two cars seized there and so billed I am convinced established that it was gasoline, and creates a very strong presumption that the others may have been of that character also.

No reasonable explanation has been offered by the plaintiff as to why it failed to furnish reports of its shipments as it had promised, or why these circuitous methods were used in handling its business. Neither do I think any satisfactory excuse has been given for attempting to divert the cars after they were seized, instead of either litigating the matter out at the point of seizure, or calling upon the purchaser to take the shipment and pay the tax, as would seem to have been the natural course, instead of incurring additional freight charges by reshipping and taking a chance of selling elsewhere. None of these supposed purchasers have been called to verify the bona fides of the transactions, as could have been done if they were genuine business dealings, without design to defeat the tax. Under the circumstances above detailed, were the officers of the state justified in believing that the plaintiff was acting in collusion with citizens of Louisiana, to avoid paying its taxes?

Section 1 of the Act No. 8 of the Legislature of 1930, amending section 4 of the Act No. 6 of 1928 (Ex. Sess.), provides in part as follows: "That every person, firm, corporation or association of persons engaged as a dealer in the handling or distribution of gasoline or motor fuel for sale, use or consumption within the State shall immediately upon the producing, refining, manufacturing, blending or compounding of any gasoline or motor fuel pay to the Supervisor of Public Accounts the tax levied herein, which is hereby made due and payable immediately upon said producing, refining, manufacturing, blending or compounding; provided further that any dealer bringing gasoline or motor fuel into the State of Louisiana for sale, use or consumption therein shall immediately pay to the said Supervisor of Public Accounts the tax levied herein which is hereby made due and payable immediately upon same coming within the boundaries of this State. Said payment shall be made by remitting or paying to the Supervisor of Public Accounts by bank draft, post office or express money order, certified check or cash. Provided further that it shall be the duty of each dealer, within twenty days after the expiration of each monthly period (to be computed from the first day of each month to the last day of each month) to file with the Supervisor of Public Accounts a statement, under oath, on forms prescribed and furnished by him, of the business conducted by such person, firm, corporation or association of persons during the last preceding monthly period, whether the tax has been paid or not, which statement shall show the number of gallons of gasoline or motor fuel that was sold to persons, firms, corporations or associations of persons within the State, used or consumed by the dealer importing same. Provided further that any dealer preferring to pay any tax due hereunder at the time that the monthly reports provided for in this section are filed will be permitted to do so provided that the said dealer shall have previously furnished the Supervisor of Public Accounts a bond guaranteeing the payment of any tax, penalties or costs accrued or accruing under this Act."

It is thus seen that the tax is imposed up-

on all who deal in motor fuel in this state, so is confronted with its own conduct, which in my opinion, on the showing made here, does not warrant the interference of a court of equity. 1 Pomeroy, Eq. Jur. (2d) § 397; 21 C. J. 182, 183.

and the collecting department has ruled that it is not payable upon substances having a flash point above 110° Fahrenheit.

Of course, a refinery in Arkansas which, in good faith, ships its products to bona fide purchasers in Louisiana, does not have to pay the tax, nor can the state in such transactions, made in good faith, seize the cars until they have been delivered, that is, the drafts paid and the bills of lading surrendered, for to do so would be a clear interference with interstate commerce, in violation of the Federal Constitution. But, if the plaintiff, under the guise of honest dealing, ships its goods into Louisiana to fictitious persons or agents of its own, with the view of finding purchasers and selling to them, after the goods have come into the state, then it could hardly deny that it was a dealer within the meaning of the law, and bound to pay the tax. Again, if it were conspiring with citizens of this state to ship to them fuel upon which the tax should be paid, falsely billed as a product on which it is not collected, and handles its business with its customers in such manner as to knowingly aid and assist them in evading payment, it would hardly be in a position to ask the aid of a court of equity. It would certainly not attempt any such practices as have been indulged in in this case, with respect to its business in Arkansas, where its officers and property are subject to the powers of its own state. The very purpose of giving to Congress control over interstate commerce was to prevent the citizens of one state from indulging in petty and unjust discriminations against the other or its citizens, and a federal court is peculiarly constituted to enforce this common duty to mutually regard the rights of one another. This is one of the very wise and far-seeing concepts of the framers of the Federal Constitution, which has served to prevent strife like that between some of the states of Europe. I do not mean to say that there was any legal duty, whatever may be said about the moral obligation, on the part of plaintiff to make the requested reports to the defendants of its interstate shipments; at the same time, it was clearly without right to aid or connive with the citizens of Louisiana in the violation of the latter's laws. This case does not involve any claim on the part of a bona fide holder of a bill of lading, requiring application of section 103 of title 49 of the United States Code (49 USCA § 103), under which refuge is sought by the plaintiff. It alone is complaining, and in doing

If, in the future, the state of Louisiana undertakes to seize the property of plaintiff while it is in interstate commerce, under bona fide sales made to its customers in Louisiana without questionable circumstances, then it will be time enough to listen to its complaint. For the present, I think the relief should be denied and plaintiff should be relegated to the remedies which the law affords for the determination of the issues raised in the suits filed in the state courts, where ample opportunity can be had to defend, with the right of review of the federal questions by the Supreme Court of the United States.

The suit will be dismissed, without prejudice to the right to renew the application for injunction, should circumstances warrant it in future.

Proper decree may be presented.